Robert W. Lambert, Appellant, v. Paul W. Senne Funeral Home, Inc., Appellee.

Gen. No. 45,263.

Opinion filed March 27, 1951.
Rehearing denied April 12, 1951. Released for publication April 13, 1951.

WILLIAM S. JACOB, and RAYMOND F. KELLY, both of Chicago, for appellant.

JOHN J. MACIEJEWSKI, of Chicago, for appellee; CHARLES D. SNEWIND, of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Robert W. Lambert, plaintiff, sued Paul W. Senne Funeral Home, Inc., defendant, to recover damages for personal injuries sustained by him at the Funeral Home of defendant. A jury returned a verdict in favor of defendant and judgment was entered thereon. Plaintiff appeals.

Plaintiff contends that the trial court committed reversible error in giving to the jury at the instance of defendant instructions numbers 15 and 16, which read as follows:

"#15. The Court instructs the jury that a volunteer is one who introduces himself into matters which do not concern him by doing or undertaking to do something he is not bound to do.

"#16. You are instructed that the only duty a defendant has towards a volunteer is not to injure him wilfully. If you find from the evidence and under the instructions of the Court that the plaintiff, Robert W. Lambert, at the time and just before the occurrence of July 14, 1946, was a volunteer, and if you further find from the evidence and under the instructions of the Court that the defendant, Paul W. Senne Funeral Home, Inc. did not injure him wilfully, then you should find the said defendant not guilty."

It is well stated in *Commonwealth v. Federal Land Bank,* 11 S. W. (2d) 698, 699, that "no strict rule can

137

be laid down, nor definition of a volunteer given without qualification, as each case must be decided on its own merits.''

In *Voltz v. Nat. Bank of Illinois,* 158 Ill. 532, the court states (p. 542): ''A person who, though not obliged to do an act, yet has an interest in doing it, is not to be regarded as necessarily and simply a volunteer. (*Wright v. London and N. W. Railway Co.,* L. R. 1 Q. B. Div. 252; *Holmes v. N. E. Railway Co.,* L. R. 4 Ex. 254; 6 Ex. 123.)'''

In *Ranson-Rooney v. Overseas Ry.,* 134 So. 765, 768, the court quotes with approval the following from 28 R. C. L. 761:

''One who performs services for another, at the instance of an accredited employee of the latter, is not to be deemed a volunteer, where it appears that the inducing employee was clothed with actual authority to engage assistance, *or where there existed an emergency from which the law implies an authority to secure the help of other persons.''* (Italics ours.)

In *Empire Laundry Machinery Co. v. Brady,* 60 Ill. App. 379, 383, the court held:

''The deceased was not a mere volunteer; he not only had an interest in the work appellant was doing, but he was specially asked by appellant's agent to assist him in his work. *Street Ry. Co. v. Bolton,* 43 Ohio State Rep. 224.'' See, also, *Empire Machinery Co. v. Brady,* 164 Ill. 58, where the judgment of the Appellate court was affirmed.

In *White v. Great Northern Ry. Co.,* 170 N. W. 849, 851, the court held that ''where one has an interest in the work, and at the request or with the consent of another's servants undertakes to assist them, he does not do so at his own risk. The difference is in the presence or absence of self-interest.''

The following are the pertinent facts in this case: On July 14, 1946, plaintiff was at defendant's ''funeral

home'' because plaintiff had employed defendant to conduct the funeral services for his deceased wife. Plaintiff was sitting with friends and relatives in the main chapel, where his wife's body was lying. The chapel is situated on the first floor near the entrance to the premises. Leonard Urso was the only employee of defendant then upon the premises. Harold L. Senne, vice-president of defendant, testified that when he was absent from the premises Urso was in a position to fully conduct the business of the establishment, to do the things that he himself would do if he were present; that at the time in question he left Urso alone in the establishment, as he had many times before; that Urso's duties and his authority were more or less comprehensive in the operation and conduct of the funeral home; that ''in all the operations around the place and anything he had to do he did not have to stop and consult me or some other member of the corporation. Generally, throughout all his duties in the operation of the funeral home, he would not have to consult me about each and everything he did. It would have to be something very special and out of the ordinary that he would have to consult me''; that ''Urso would have some discretion in the manner of how he should act and conduct himself.'' The evidence shows that the funeral home was equipped with an air conditioning system, located on the second floor; that about three o'clock P. M. on the day in question Urso noticed that water was coming through the ceiling of the reception room in the funeral home and dropping on the floor; that the reception room is near the door where people enter and leave the premises; that Urso found that this water was coming from the air conditioning unit; that the floor was covered with water; that the water was all over the carpet covering an area about three feet long and part of the steps; that there were little pools of water around the edge of the carpet; that

139

plaintiff had served in the U. S. Navy for seven years, where he did machinist's work; that he and Urso were acquaintances; that Urso came into the chapel and asked plaintiff if he would give him a hand with the air conditioning unit, stating that it was leaking; that plaintiff told Urso it was hard for him to get away; that Urso then stated it would only take a few minutes, and plaintiff stated he supposed he could get away for a few minutes; that he thereupon went to his brother-in-law's car and picked up a flashlight and a screw driver and went back to where Urso was; that plaintiff removed the front of the air conditioning unit; that it was dark there; that they found that water in the tray in the unit was overflowing onto the second floor; that the water was standing in pools and coming through the ceiling, that there was a constant dripping; that plaintiff began to sop up the water around the air conditioning unit with rags and wrung the rags into a pail which Urso brought; that while plaintiff was so engaged Urso went downstairs to the embalming room and returned; that Urso handed plaintiff the end of a hose and as plaintiff got the hose in his hand he was hit in the left eye with a fluid; that he did not see any bulb on the hose and did not know it was a syringe or what use Urso was going to make of the hose; that when the piece of hose was handed to plaintiff it was level with his face as he bent over the railing; that he had a rag in one hand and as Urso handed the hose to him he took it in his left hand and "got it in the eye"; that Urso then stated that some cavity (embalming) fluid must have been in the bulb. The evidence shows that embalming fluid is formaldehyde gas dissolved in water; that it is caustic and penetrates deeply into the tissues; that after plaintiff got the fluid in his eye he suffered great pain and a terrible burning in his left eye; that eventually he lost the

sight of his left eye. Urso testified that after the front of the air conditioning unit was opened he called Harold Senne, vice-president of the funeral home, who lived close by, and told him the air conditioning unit was leaking, and Mr. Senne told him to get a sponge and sop up the water; that he went downstairs but could not find a sponge and he picked up a syringe that had a bulb in the middle and on each end there was about six inches of tubing one-half inch in diameter; that the syringe was used in caring for bodies and that he was familiar with its use; that when he squeezed the bulb he looked up and saw plaintiff with some of the fluid in his face; that when plaintiff told him he had a sharp burning pain in his left eye he took plaintiff to the washroom and applied water to his eye and face; that the last time he had used the syringe it contained embalming fluid; that the syringe was used a day or so before the time in question and that it might still have contained a small portion of such liquid, even if it had been squeezed four or five times; that some cavity fluid must have been in the bulb and squirted on plaintiff's face. Harold Senne further testified that he lived seven or eight hundred feet north of the funeral home; that he had gone home to eat around 2:30 or 2:45; that he had no definite hour to return and could return at his convenience; that Urso had no power to hire, discharge, or engage workmen; that there was no written contract between Urso and defendant defining Urso's duties; that Urso did not have the duty to maintain the machinery; that he received the phone call from Urso while he was at dinner and that Urso told him the air conditioning unit was leaking and water was seeping through the ceiling onto the first floor; that he told Urso to take a sponge and sop it up; that he returned to the funeral home about twenty minutes after Urso telephoned him; that when

plaintiff "informed me his eye was burning and I saw the syringe, I had a pretty good idea what had happened"; that he directed plaintiff to go to the washroom and wash the eye with water; that he did not tell plaintiff to use the syringe or request him to assist Urso; that he did not contract with plaintiff for any services.

The undisputed evidence shows that plaintiff did not introduce himself into the situation; that Urso was acquainted with plaintiff, who had served in the U. S. Navy for seven years where he did machinist's work, and that Urso asked plaintiff to give him a hand with the air conditioning unit, which was leaking; that plaintiff told Urso it was hard for him to get away but that Urso stated it would only take a few minutes, and plaintiff thereupon agreed to help Urso. Nor can it be reasonably argued that plaintiff had "no concern" in the operation of the air conditioning unit. It was summertime, and the service which defendant was rendering included air conditioning. Water was dripping through the ceiling of the reception room and onto the floor where persons wishing to pay their last respects to plaintiff's wife would necessarily walk.

██ Instruction #15 told the jury, in effect, that if plaintiff were undertaking to do something he was not "bound to do" he would be a volunteer. The word "bound" means obliged, constrained or compelled. As plaintiff was, of course, not bound to assist Urso, instruction #15 practically told the jury to find that plaintiff was a volunteer; and instruction #16 told the jury that if they found that plaintiff was a volunteer then if defendant did not injure plaintiff wilfully they should find defendant not guilty. It would be a serious reflection upon the law if defendant, under the undisputed facts of this case, owed only the duty to plaintiff not to injure him wilfully. Counsel for

142

defendant, upon the oral arguments, conceded that if there had been a fire upon the premises at the time in question an emergency would exist that would warrant Urso in securing the help of plaintiff and that plaintiff in aiding Urso would not be a volunteer. The air conditioning trouble created a serious emergency and under such circumstances the law implied an authority in Urso "to secure the help of other persons." We are satisfied that under the undisputed facts no instruction as to a volunteer would be applicable. Instructions #15 and #16 were so erroneous and prejudicial that they are a sufficient reason, alone, to warrant a reversal of the instant judgment.

Plaintiff contends that the trial court committed reversible error in giving to the jury defendant's instruction #3, which reads as follows:

"The Court instructs the jury, that corporations can only act by and through their agents, and when a corporation holds out a person to the public as authorized to act in its behalf, then the corporation may be bound by the acts of such agent, provided such acts are done within the scope of such agent's authority."

Plaintiff asked the court to give the following instruction to the jury:

"The court instructs the jury, that corporations can only act by and through their agents, and when a corporation holds out a person to the public as authorized to act in its behalf, then the corporation may be bound by the acts of such agent, provided such acts are done within the apparent scope of such agent's authority. 'A' "

Plaintiff contends that the court erred in refusing to give his instruction to the jury. In *Lindroth v. Walgreen Co.*, 329 Ill. App. 105, Walgreen Company contended that the trial court properly directed a verdict

for the defendant for the reason that there was no proof that the defendant's clerk had authority to make any such express warranty as plaintiff claims was made by the clerk and that no authority to make any such express warranty could be implied. In passing upon this contention we stated (pp. 116, 117):

". . . Plaintiff is not, of course, bound by any secret arrangement between defendant Walgreen Company and its agent, the saleslady. As to the latter's authority to warrant merchandise, defendant is bound by the apparent scope of the agent's authority in its dealings with the public. See *Eckhart Carriage Co. v. Eden*, 163 Ill. App. 552, 554; *Mulhern v. Public Auto Parks, Inc.*, 296 Ill. App. 238, 243. In this last case the court stated (p. 243): 'It was not necessary for plaintiff to prove actual authority. Defendant was as to plaintiff bound by the apparent authority of the attendant. . . . The principal is just as much bound by authority, which through his acts he appears to give, as by that which has actually been given. (*Nash v. Classen*, 163 Ill. 409.) The scope of an agent's authority may be shown as well by circumstances as by proof of express authority. (*Springfield Engine & Threshing Co. v. Green*, 25 Ill. App. 106, 110.)' "

■ We hold that the trial court committed serious error in giving to the jury defendant's instruction #3 and in refusing to give to the jury plaintiff's instruction "A".

■ Plaintiff contends that the trial court erred in giving to the jury on behalf of defendant other instructions, but we do not deem it necessary to refer specially to these instructions as they are not likely to be given upon another trial. As to several of the instructions defendant merely argues that they did not constitute reversible error. It appears that the trial court gave twenty-two instructions to the jury on behalf of de-

144

fendant. Plaintiff is warranted in contending that he was instructed out of court.

We are satisfied that plaintiff did not receive a fair trial. The judgment of the Superior court of Cook county is reversed, and the cause is remanded for a new trial.

*Judgment reversed and cause remanded for a new trial.*

SCHWARTZ, P. J. and FRIEND, J., concur.