# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 19, 2022        Decided March 4, 2022

No. 21-5200

NANCY GIMENA HUISHA-HUISHA, AND HER MINOR CHILD, ET AL.,
APPELLEES

v.

ALEJANDRO N. MAYORKAS, SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-00100)

———

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for appellants. With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, and *Joshua Waldman* and *Ashley A. Cheung*, Attorneys.

*John M. Miano* was on the brief for *amicus curiae* Immigration Reform Law Institute in support of appellants.

*Judd E. Stone, II,* Solicitor General, Office of the Attorney General for the State of Texas, *Ryan S. Baasch*, Assistant Solicitor General, and *Leif A. Olson*, Special Counsel, were on

the brief for *amicus curiae* The State of Texas in support of appellants.

*Lee Gelernt* argued the cause for appellees. With him on the brief were *Stephen B. Kang, Cody Wofsy, Omar Jadwat, David Chen, Blaine Bookey, Karen Musalo, Robert Silverman, Scott Michelman, Arthur B. Spitzer,* and *Tamara F. Goodlette.*

*Noah A. Levine* and *Daniel S. Volchok* were on the brief for *amici curiae* Scholars of Refugee and Immigration Law in support of appellees.

*Ilya Shapiro* and *Ilya Somin* were on the brief for *amicus curiae* The Cato Institute in support of appellees.

*Kathryn Austin, Geroline A. Castillo, Mariko Hirose,* and *Deepa Alagesan* were on the brief for *amicus curiae* The International Refugee Assistance Project, Inc. in support of appellees.

*Raymond P. Tolentino* and *Mahrah M. Taufique* were on the brief for *amici curiae* Historians in support of appellees.

*Dimitri D. Portnoi* was on the brief for *amici curiae* 14 Legal Service and Advocacy Organizations in support of appellees.

*Vincent Levy* was on the brief for *amicus curiae* United Nations High Commissioner for Refugees in support of appellees.

*Kathleen R. Hartnett* and *Julie Veroff* were on the brief for *amici curiae* HIAS, et al. in support of appellees.

*Charles Tucker, Jr.* was on the brief for *amici curiae* The National Haitian American Elected Officials Network, et al. in support of appellees.

Before: SRINIVASAN, *Chief Judge*, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*:

In a public-health emergency, 42 U.S.C. § 265 authorizes the Executive Branch to "prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate."

The Executive has exercised that power during the COVID-19 pandemic. It has issued a series of orders prohibiting "covered aliens" from entering the United States by land from Mexico or Canada. Those covered aliens, as a general matter, lack valid travel documents. The orders subject them to immediate expulsion from the United States.

The Plaintiffs are a group of covered aliens. They argue that expulsions under § 265 are illegal. We disagree, at least at this stage of the case. We find it likely that aliens covered by a valid § 265 order have no right to be in the United States, and the Executive can immediately expel them.

But § 265 does not tell the Executive *where* to expel aliens. Another statute does that. Section 1231 of Title 8 lists several possible destinations. 8 U.S.C. § 1231(b)(1)-(b)(2). It adds that the Executive cannot remove aliens to a country where their "life or freedom would be threatened" on account of their "race, religion, nationality, membership in a particular social

group, or political opinion." *Id.* § 1231(b)(3)(A). And it prohibits the Executive from expelling aliens to a country where they will likely be tortured. *Id.* § 1231 note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); *see also* 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1.

Before proceeding, we must make clear two things about § 1231. First, it does not give aliens a path to asylum or other legal status in the United States. For aliens covered by a valid § 265 order, the Executive has eliminated that path, and § 1231 does not restore it. Second, § 1231 does not stop the Executive from detaining aliens, within constitutional limits, until they can be expelled to an appropriate country. 8 U.S.C. § 1231 note ("Nothing in this section shall be construed as limiting the authority of the Attorney General to detain any person under any provision of law"); *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (discussing constitutional limits).

So in short, the Executive can expel the Plaintiffs from the country. But it cannot expel them to places where they will be persecuted or tortured.

To explain why — and why the Plaintiffs are entitled to a preliminary injunction narrower than the one they want — our opinion includes five parts:

- We begin with a brief history of the nation's immigration laws (Part I).

- Next we describe the Executive's original § 265 order from March 2020, its subsequent § 265 orders, and the Plaintiffs' legal challenge to those orders (Part II).

- We then turn to the Plaintiffs' likelihood of success on the merits and reject their arguments that § 265 covers only transportation providers such as common carriers; that the Executive has no power to expel aliens for violating a valid § 265 order; and that they are entitled to apply for asylum (Part III).

- After that, we explain why the Plaintiffs are likely to succeed on the merits of their narrow argument that under § 1231 the Executive cannot expel them to places where they face persecution or torture (Part IV).

- Finally, we conclude the District Court did not abuse its discretion in finding that the equities require a preliminary injunction to stop the Executive from expelling the Plaintiffs to places where they will be persecuted or tortured (Part V).

I

A

"The executive Power" of the United States is vested in the President. U.S. Constitution art. II, § 1, cl. 1. Inherent in that executive power is the President's "vast share of responsibility for the conduct of our foreign relations." *American Insurance Association v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)). And that "inherent executive power" to govern foreign relations includes considerable authority over immigration. *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

Congress too has "broad power over naturalization and immigration." *Demore v. Kim*, 538 U.S. 510, 521 (2003)

(quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)).  To give just one example that will be important to our later analysis, Congress has prohibited the Executive from removing aliens to countries where they will be persecuted.  8 U.S.C. § 1231(b)(3)(A).

Although Congress has sometimes limited executive discretion in such ways, at other times it has granted the Executive express powers over immigration.  As early as 1798, Congress provided that the Executive could expel certain aliens.  An Act Concerning Aliens, § 1, 1 Stat. 570, 570-71 (1798); *see also Session v. Dimaya*, 138 S. Ct. 1204, 1229-30 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (the power was controversial, went unused, and expired in 1800).

Congress intervened again in the last quarter of the nineteenth century.  *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972).  It authorized the Executive to exclude aliens with "a loathsome or a dangerous contagious disease."  Act of March 3, 1891, ch. 551, § 1, 26 Stat. 1084, 1084.  It also provided that any alien who entered the country in violation of the Executive's prohibitions "may be returned" within one year of unlawfully entering the United States.  *Id.* § 11, 26 Stat. at 1086.  And it continued to grant the Executive such authority for years to come.  Act of February 5, 1917, ch. 29, § 18, 39 Stat. 874, 887 ("all aliens brought to this country in violation of law shall be immediately sent back").

In 1893, Congress passed the precursor to the statute at issue in this case.  Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452.  That year, cholera was overrunning much of the world.  *See Cholera Through History*, Britannica, https://www.britannica.com/science/cholera/Cholera-through-history  (last visited Feb. 17, 2022).  In response, Congress authorized the

Executive to determine that individuals from certain countries should be excluded from the United States during public-health emergencies.

Despite the cholera pandemic, the Executive did not issue a prohibition under that law until 1929. In response to a meningitis outbreak that year, the Executive declared that the "continued arrival of vessels" carrying meningitis-infected passengers had "overtaxed the combined available quarantine facilities of federal and local health authorities." Exec. Order No. 5143 (June 21, 1929), App. 201. It therefore ordered that "no persons may be introduced directly or indirectly by transshipment or otherwise into the United States" from China or the Philippines "for such period of time as may be deemed necessary." *Id.*

Fifteen years later, the 1893 statute was recodified at 42 U.S.C. § 265, given a new title, and slightly edited. It now reads in full:

> Suspension of entries and imports from designated places to prevent spread of communicable diseases
>
> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, **the Surgeon General**, in accordance with regulations approved by the

President, **shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate** in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265 (emphases added).

In 1966, acting pursuant to the Reorganization Act of 1949, President Johnson transferred the Surgeon General's authority to what is now the Department of Health and Human Services. 31 Fed. Reg. 8855 (June 25, 1966). Today, the Centers for Disease Control and Prevention, which is part of HHS, exercises the authority that § 265 gave the Surgeon General. 85 Fed. Reg. 16,559, 16,560, 16,563 (Mar. 24, 2020).

## B

Between 1929 and 2020, as § 265 lay dormant, Congress remade immigration law.

In 1952, Congress passed and President Truman signed the Immigration and Nationality Act. Like earlier laws, it expressly authorizes the Executive to deport various classes of aliens. They include aliens present in violation of the law:

> **Any alien who is present** in the United States **in violation of** this chapter or **any** other **law** of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, **is deportable**.

8 U.S.C. § 1227(a)(1)(B) (emphases added).

However, the Immigration and Nationality Act (as amended since 1952) provides aliens with procedural and substantive rights to resist expulsion.  Their procedural rights include the opportunity to contest removal before an immigration judge and then to appeal that immigration judge's decision to the Board of Immigration Appeals and a federal court of appeals.  *Id.* §§ 1229a, 1252(b); 8 C.F.R. § 1240.15. And their substantive rights include three types of relief relevant to this case: asylum, withholding of removal, and protections under the Convention Against Torture.

"Asylum" relief is a discretionary protection that the Attorney General "may grant" to aliens who meet the statutory definition of "refugee" because of their "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their home country.  8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42).  "Any alien who is physically present in the United States . . . irrespective of such alien's status . . . may apply for asylum" within one year of arriving in the United States.  *Id.* § 1158(a)(1), (a)(2)(B).  And a refugee who receives asylum may lawfully live and work here.  *Id.* § 1158(c).

"Withholding of removal" relief protects aliens from removal to a particular country if it is likely that their "life or freedom would be threatened" based on a protected category such as race or religion.  *Id.* § 1231(b)(3)(A).

"Convention Against Torture" relief protects aliens from removal to countries where they face a likelihood of torture. *Id.* § 1231 note ("United States Policy With Respect to

Involuntary Return of Persons in Danger of Subjection to Torture"); 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1.[1]

Both "withholding of removal" and "Convention Against Torture" relief are codified in 8 U.S.C. § 1231, and those two types of § 1231 relief differ from asylum relief in important ways. First, they do not entitle aliens to any legal status in the United States. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987); *Nasrallah v. Barr*, 140 S. Ct. 1683, 1687 (2020). Second, they are mandatory: The Executive must provide them to aliens who qualify for them. *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) ("withholding [of removal] is mandatory if an alien establishes that it is more likely than not that he would be subject to persecution on one of the specified grounds" (cleaned up)); *Nasrallah*, 140 S. Ct. at 1687 ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to [Convention Against Torture] relief and may not be removed to that country (although he still may be removed to other countries).").[2]

---

[1] Certain well-defined classes of aliens are ineligible to seek withholding of removal and some forms of relief under the Convention Against Torture. For example, withholding of removal does not apply to aliens who have themselves persecuted others or who may pose "a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B); *id.* § 1231 note ("Exclusion of Certain Aliens"); 8 C.F.R. § 1208.16(d).

[2] Because the Immigration and Nationality Act's protections slowed down removal proceedings, in 1996 Congress created "expedited" removal procedures in which the Executive removes aliens without giving them a hearing. 8 U.S.C. § 1225; *see also DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1964-65 (2020). But even as Congress accelerated the removal process for many aliens, it excluded from those expedited proceedings aliens with credible

\* \* \*

 In sum, pursuant to statutes:

(1) The Executive can render illegal the presence of aliens who pose a public-health risk during a public-health emergency.  42 U.S.C. § 265.

(2) The Executive can expel those aliens.  42 U.S.C. § 1227(a)(1)(B).

(3) The Executive cannot expel those aliens to places where they will be persecuted or tortured.  8 U.S.C § 1231(b)(3)(A) & note.

## II

### A

When 2020 began, many people had not yet heard of COVID-19.  But by the end of March, much of the nation was locked down.  The rest of that year was defined by uncertainty, a changing disease, limited knowledge even within the medical community, and the need for immediate private and public action.

Section 265 of Title 42 was part of the Executive's early response.  In March 2020, HHS issued an interim final rule to implement § 265 and "enable the CDC Director to suspend the introduction of persons into the United States."  85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020).  This interim rule defined the

---

asylum claims or credible fears of persecution in their home countries. *Thuraissigiam*, 140 S. Ct. at 1965.

12

"introduction into the United States of persons from a foreign country" as "the movement of a person from a foreign country . . . so as to bring the person into contact with persons in the United States . . . in a manner that the Director determines to present a risk of transmission of a communicable disease." *Id.* at 16,566.   That definition covered "those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease." *Id.* at 16,563.

Two days later, the CDC applied that interim final rule and issued an order banning certain "covered aliens" from entering the United States from Canada or Mexico.   85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020).   "Covered aliens" are aliens "who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in congregate settings in [Ports of Entry] or Border Patrol stations to facilitate immigration processing."   *Id.*   As a general matter, that means aliens who "lack valid travel documents."   *Id.*

In September 2020, HHS and the CDC issued a final rule implementing § 265.  85 Fed. Reg. 56,424 (Sept. 11, 2020).  It reiterated the interim final rule and noted that § 265 refers to "a suspension of the right to introduce such persons and property." *Id.* at 56,442.  It asserted that this "suspension" clause in § 265 grants the CDC the "authority to temporarily suspend the effect of any law, rule, decree, or order by which a person would otherwise have the right to be introduced or seek introduction into the U.S."  *Id.* at 56,426.

Since then, the CDC has continued to reissue its § 265 order.  The only substantial change came in February 2021, when the CDC excluded unaccompanied minors from the definition of "covered aliens" following the decision in *P.J.E.S.*

*v. Wolf*, 502 F. Supp. 3d 492, 501 (D.D.C. 2020). 86 Fed. Reg. 9942 (Feb. 17, 2021); 86 Fed. Reg. 38,717 (July 22, 2021). The CDC issued its most recent § 265 order on August 5, 2021. 86 Fed. Reg. 42,828.

In carrying out those § 265 orders, the Executive has expelled "covered aliens" without allowing them to apply for asylum or seek relief from removal to a place where they will face persecution. App. 214.[3]

B

The Plaintiffs are six families of aliens covered by the CDC's latest order, which we'll call the § 265 Order. They sued the Executive on behalf of a class of all families similarly covered by the § 265 Order. They want the Executive to stop expelling them under the power it claims § 265 provides. They claim that § 265 does not empower the Executive to expel them; that the § 265 Order violates the Immigration and Nationality Act's provisions for asylum, withholding of removal, and relief under the Convention Against Torture; and that the § 265 Order is arbitrary and capricious.

In September 2021, the district court certified the Plaintiffs' class and preliminarily enjoined the Executive from expelling them under the § 265 Order. *Huisha-Huisha v. Mayorkas*, No. CV 21-100 (EGS), 2021 WL 4206688, at *1 (D.D.C. Sept. 16, 2021). In assessing the Plaintiffs' likelihood of success on the merits, the district court agreed with the Plaintiffs' primary argument that § 265 does not provide for

---

[3] The Executive has formally provided a limited opportunity for covered aliens to seek relief under the Convention Against Torture, but the parties in this case dispute whether that opportunity exists in practice. App. 212.

expulsions. *Id.* at \*11. On the other injunction factors, the district court concluded the Plaintiffs faced irreparable harm that tipped the balance of equities in their favor because of the "violence, persecution, and other victimization" they could suffer if they are expelled from the country under the § 265 Order. *Id.* at \*15-18.

At the Executive's request, we stayed the preliminary injunction while we resolve the Executive's appeal. *Huisha-Huisha v. Mayorkas*, No. 21-5200 (D.C. Cir. Sept. 30, 2021).

We review the district court's decision to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

In doing so, we apply the *Winter* test: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

III

The Plaintiffs make several merits arguments on which they are not likely to prevail.

A

We begin with the Plaintiffs' broadest argument — that 42 U.S.C. § 265 applies only to third parties who "introduce" other people or property into the country. If so, § 265 would cover common carriers and other third-party transportation

providers.[4]  But it would not cover individuals who enter the country.

Section 265 gives the Executive the power to prohibit "the introduction of persons or property" into the United States. Contrary to the Plaintiffs' contention, that provision is most naturally read to include the entry of individuals who pose a danger to public health.

To be sure, common carriers can introduce people into the country.  But individuals can also introduce themselves.  *See Lambert v. Paul W. Senne Funeral Home, Inc.*, 98 N.E.2d 519, 522 (Ill. App. Ct. 1951) ("The undisputed evidence shows that plaintiff did not introduce himself into the situation"); *Bales v. State*, 63 Ala. 30, 36 (1879) ("Yet, there can be no doubt, if a juror, having a disqualifying opinion, should introduce himself into the jury-box, by concealing, or by failing to disclose it from mere ignorance, a conviction by a verdict in which he participated would be set aside").  So § 265 covers both.  And when President Hoover invoked § 265 in 1929 — the only time it was used before 2020 — his order applied to the introduction of individuals "by transshipment *or otherwise*."  Exec. Order No. 5143 (June 21, 1929), App. 201 (emphasis added).

Congress might have been clearer if it had used a word like "entry" rather than "introduction" when referring to the Executive's power to prohibit individuals from coming here. But Congress did refer to the "suspension of entries" in § 265's title.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("the title of a statute and the heading of a section are tools available for the resolution of a doubt about the

---

[4] For ease of reading, we'll use the familiar phrase "common carriers" to cover the slightly more inclusive but also more unwieldy phrase "third-party transportation providers."

meaning of a statute" (cleaned up)); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 221 (2012) ("The title and headings are permissible indicators of meaning.").

In addition, Congress's choice of the word "introduction" rather than a word like "entry" makes sense in this context for two reasons.

First, Congress expressly intended to cover both "persons and property." Both can be "introduced" into the country. Property is introduced by third parties, and individuals are introduced by third parties *or* themselves.

Second, by saying "introduction" rather than "entry," Congress found a concise way to cover both individuals *and* common carriers. In contrast, if Congress had permitted the Executive to prohibit only the "entry" of individuals, the Executive may not have been able to prohibit common carriers from bringing people into the country. That would have been an odd result because passenger ships were a major means of immigration when § 265's predecessor was enacted in 1893 and when § 265 was enacted in 1944.

The statutory provisions surrounding § 265 provide further confirmation that § 265 applies to individuals who introduce themselves into the country. Unlike § 265, its surrounding provisions single out "vessels" and other common carriers, which makes § 265's omission of a common-carrier reference look intentional. 42 U.S.C. §§ 267(b), 269(a), 270, 271(b). We don't place undue weight on the "'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation," but that rule is especially strong here because Congress enacted § 265 in the same legislation as the statutory provisions regulating common carriers. *Comm'r v. Beck's Estate*, 129

F.2d 243, 245 (2d Cir. 1942); *cf. DHS v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

To be candid, because ships were a major means of immigration, we don't doubt that the readers of § 265 would have thought primarily of passenger ships when its predecessor was enacted in 1893 and when it was enacted in 1944. But for whatever reason — and we've described several possibilities — Congress went further. A statute's "remedy often extends beyond the particular act or mischief which first suggested the necessity of the law." *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008) (quoting Joel Prentiss Bishop, *Commentaries on Written Laws and Their Interpretation* § 51 (1882)).

In addition, we cannot apply the constitutional avoidance canon to exclude individuals from the scope of § 265. It's true that applying § 265 to American citizens would raise serious constitutional questions. That exercise of power would be "breathtaking." *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021); *see also Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019) ("A fundamental attribute of United States citizenship is a right to remain in this country and to return after leaving." (cleaned up)). But the Plaintiffs are not American citizens. Neither are any of the individuals covered by the order under review. In the immigration context, the law often allows policies that "would be unacceptable if applied to citizens." *Reno v. Flores*, 507 U.S. 292, 305-06 (1993) (cleaned up); *see also id.* at 314 n.9 ("The constitutional doubts argument has been the last refuge of many an interpretive lost cause. Statutes should be interpreted to avoid *serious* constitutional doubts, not to eliminate all possible contentions that the statute *might* be unconstitutional." (cleaned up)). And in any event, the Plaintiffs' preferred reading of the statute

would permit violators of a § 265 order to be imprisoned for up to a year, which could still raise constitutional concerns if used to keep American citizens out of the country.

B

Next, the Plaintiffs argue that even if § 265 applies to individual aliens who introduce themselves into the United States, the Executive cannot expel those aliens because § 265 does not authorize expulsions. The District Court agreed with the Plaintiffs. *Huisha-Huisha*, 2021 WL 4206688, at *11. We do not.

Two statutes — § 265 and 8 U.S.C. § 1227(a)(1)(B) — appear to provide the Executive with ample authority to expel such aliens.

Start with the first of those statutes — § 265. Recall that it allows the Executive to "prohibit, in whole or in part, the introduction of persons and property from" any places that it designates during a public-health emergency. And recall that the Executive has used that power during the COVID-19 pandemic to issue several orders that prohibit covered aliens from entering the United States. That statutory power could be rendered largely nugatory if the Executive could not take any action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil.

The § 265 Order also means covered aliens who enter at this time are here illegally. That brings into play the second statute — § 1227(a)(1)(B). Recall that it says, "Any alien who is present in the United States in violation of . . . any . . . law of the United States . . . is deportable." 8 U.S.C. § 1227(a)(1)(B). That means, barring any exceptions Congress creates

elsewhere, the Executive can expel aliens who are here illegally.[5]

So to sum up, the Executive has declared covered aliens' introduction illegal (under § 265), and as a general matter, the Executive can expel aliens who are here illegally (under § 1227(a)(1)(B)).

The Plaintiffs reply that aliens finish introducing themselves once they cross the border, so any power to expel them for violating the § 265 Order ends there — an inch inside the country. But that runs into a recent Supreme Court precedent. In *DHS v. Thuraissigiam*, the Court said that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'" 140 S. Ct. 1959, 1982-83 (2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

No doubt, aliens who make it one foot over the border are on U.S. soil and are thus entitled to certain statutory protections. *Id.* at 1983 (such an alien "has only those rights regarding admission that Congress has provided by statute"). But that doesn't mean they have been fully "introduced" into the United States as § 265 uses the term, especially given that § 265 strives to prevent a "serious danger of the introduction of . . . disease into the United States," not merely to stop a disease at the border.

---

[5] That power is nothing new. *See* Act of March 3, 1891, ch. 551, § 10, 26 Stat. 1084, 1086 ("That all aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in."); Act of February 5, 1917, ch. 29, 18, 39 Stat. 874, 887 ("all aliens brought to this country in violation of law shall be immediately sent back . . . to the country whence they respectively came").

In light of that statutory authority, we have no occasion to reach the question whether, even if no statute gave the Executive an expulsion power — in other words, even if the Executive is operating in *Youngstown* Category Two rather than *Youngstown* Category One — Article II's Vesting Clause would alone empower the Executive to expel the Plaintiffs. *See* U.S. Constitution art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America.").[6]

The District Court may, however, wish to consider that question. "The exclusion of aliens . . . . stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And as with exclusion, perhaps so too for expulsions: "Removal decisions, including the selection of a removed alien's destination, may implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. ICE*, 543 U.S. 335, 348 (2005) (cleaned up).

---

[6] When Congress authorizes executive action, the Executive's power is at its height (Category One). *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring). When Congress is silent, the Executive can exercise only its independent powers (Category Two). *Id.* at 637. And when Congress has curbed those independent powers, the Executive's power is at its "lowest ebb" (Category Three). *Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) ("To succeed in this third category, the President's asserted power must be both 'exclusive' and 'conclusive' on the issue." (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring))).

C

The Plaintiffs argue that when aliens are expelled under the § 265 Order, the Executive is operating in neither *Youngstown* Category One nor *Youngstown* Category Two. They say 8 U.S.C. § 1158(a)(1) puts the Executive's actions in *Youngstown* Category Three.

Section 1158(a)(1) entitles aliens — even those who enter the country illegally — to apply for asylum before they are expelled.[7] According to the Plaintiffs, the Executive violates § 1158(a)(1) when it expels aliens before allowing them an opportunity to apply for asylum.

That argument deserves attention from the District Court when it considers the merits. It may be the closest question in this case. But on its merits, at this stage of the litigation, the Plaintiffs have not shown they are likely to succeed.

In normal times — when the Executive has not invoked § 265 — the Plaintiffs are of course correct about § 1158(a)(1). So the question is how, if at all, we can reconcile § 265 and § 1158(a)(1). *See Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (when a court is "confronted with two Acts of Congress allegedly touching on the same topic," the court must "strive to give effect to both" (cleaned up)); *see also* Scalia & Garner, *Reading Law* 180 ("The provisions of a text

---

[7] 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.").

should be interpreted in a way that renders them compatible, not contradictory.").[8]

The best reconciliation of the two statutes is based on the discretionary nature of asylum. The Executive "may grant asylum." 8 U.S.C. § 1158(b)(1)(A). Or it may not. It is a matter of executive "discretion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (§ 1158 "authorizes the Attorney General, in his discretion, to grant asylum to an alien"). And here, for public-health reasons, the Executive has shown an intent to exercise that "discretion" by foreclosing asylum for the specific subset of border crossers covered by its § 265 Order.

It's true that the § 265 Order forecloses more than just a grant of asylum; it also forecloses the statutorily mandated procedures that aliens use to apply for asylum. But if the asylum decision has already been made — by the § 265 Order — then those procedures would be futile. And perhaps § 265's text alludes to the suspension of those procedures with its reference to the "suspension of the right to introduce such persons and property" as "is required in the interest of the public health."

This harmonization might explain why Congress has excluded from asylum some categories of aliens — such as those who have persecuted others — but has not categorically

---

[8] *Chevron* is of no help to the Executive. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). *Chevron* deference does not apply when an agency interprets a statute "in a way that limits the work of a second statute" that a different agency administers. *Epic Systems*, 138 S. Ct. at 1629. Here, the CDC administers § 265, but the Department of Homeland Security administers § 1158, as well as the two types of relief under § 1231 that we discuss later. *See* 8 C.F.R. § 100.1.

excluded from asylum aliens with communicable diseases. 8 U.S.C. § 1158(b)(2). Congress may have trusted that the Executive would use § 265 to protect the country from the introduction of a communicable disease from abroad when the dangers are sufficiently pronounced to warrant the invocation of that statute's grant of authority.

IV

The Plaintiffs' final argument concerns two protections that limit *where* the Executive can expel aliens, although they do not govern *whether* the Executive can expel aliens. The first protection, called "withholding of removal," precludes the Executive from removing aliens to places where they will likely be persecuted. 8 U.S.C. § 1231(b)(3)(A). The second protection, relief under the Convention Against Torture, precludes the removal of aliens to places where they will likely be tortured. *Id.* § 1231 note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); *see also* 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1.

The Plaintiffs argue that the § 265 Order violates those two limits on where the Executive can expel aliens. On that question, the Plaintiffs have shown they are likely to succeed on the merits.

A

Under the first provision, the Executive "may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

Unlike asylum relief under § 1158, withholding-of-removal relief under § 1231(b)(3)(A) is mandatory. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) (aliens "who can show a clear probability of persecution are *entitled* to mandatory suspension of deportation and *eligible* for discretionary asylum"). In other words, unlike § 1158, § 1231(b)(3)(A) gives the Executive no discretion that it can exercise through an executive order. So if the Executive expels an alien to a place prohibited by § 1231(b)(3)(A) — and if another statute does not create an exception to that prohibition — then the Executive is acting at its "lowest ebb" in *Youngstown* Category Three. Here, in its defense of the § 265 Order, the Executive does not assert such a Category Three power.

Therefore, to expel aliens to places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an exception to § 1231(b)(3)(A). It says § 265 is that statute. But we see no conflict between § 265 and § 1231(b)(3)(A).

Consider first what § 1231(b)(3)(A) does not say. It does not prohibit the Executive from immediately expelling aliens. And it does not provide them with the lawful status that § 265 forecloses. So applying § 1231(b)(3)(A) and § 265 to an alien would not make that alien's presence both legal and illegal at the same time.

Now consider what § 265 does not say. It says nothing about where the Executive may expel aliens. Neither does § 1227(a)(1)(B). Section § 1231(b) governs that aspect of aliens' expulsions. *See* 8 U.S.C. § 1231(b) ("Countries to which aliens may be removed"). In particular, § 1231(b)(3)(A)

says the Executive cannot expel them to a place where they will likely be persecuted.

As a result, we can give effect to both statutes. And because we can, we must. *See Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). That leaves the Executive with the power to expel the Plaintiffs (per § 265) to any place where the Plaintiffs will not be persecuted (per § 1231(b)(3)(A)).

B

Closely related to § 1231(b)(3)(A), the Convention Against Torture provides aliens with protections that Congress codified in a note to § 1231. Under those protections, the Executive cannot expel an alien to a country in which the alien "demonstrates that he likely would be tortured." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1687 (2020).

Like § 1231(b)(3)(A), those protections are mandatory. *Id.* Like § 1231(b)(3)(A), they limit only *where* aliens can be expelled. *Id.* And like § 1231(b)(3)(A), they grant aliens no lawful status in the United States. *See id.* at 1691.

Our earlier analysis of § 1231(b)(3)(A) thus applies equally to the protections that Congress has enacted to implement the Convention Against Torture. For the same reasons that § 265 does not allow the Executive to contravene § 1231(b)(3)(A), the Executive cannot contravene the Convention Against Torture.[9]

---

[9] On its face, the CDC's § 265 Order promises to allow Convention-Against-Torture claims to a limited degree. The parties dispute whether that promise is illusory in practice. The District Court did not reach that issue, and we need not do so here. It is a fact-bound inquiry best addressed first by the District Court.

C

The Executive argues that § 265 permits it to suspend § 1231's limits on where the Executive can expel aliens. It relies on § 265's reference to "a suspension of the right to introduce . . . persons or property."

But § 1231 does not give aliens a "right to introduce" for § 265 to suspend. Its protections do not permit aliens to enter the country. Nor do they give aliens a right to ask the Executive for lawful status once they are here. Instead, § 1231 governs where the Executive can expel aliens — a limit on executive discretion far afield from any right of aliens "to introduce" themselves into the country.

\* \* \*

The Plaintiffs have shown they are likely to succeed on the merits of their claim that § 1231 limits where the Executive can expel aliens who violate the § 265 Order.

That does not make their presence here legal. Nor does it give them a path to asylum. Nor does it stop the Executive from detaining them.[10] Nor does it curb the Executive's power to expel them to a country where they will not be persecuted or tortured. It does not even mean the Plaintiffs are certain to succeed on the merits of their § 1231 claim after it has been fully litigated: No one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case.

---

[10] *See* 8 U.S.C. § 1231 note ("Nothing in this section shall be construed as limiting the authority of the Attorney General to detain any person under any provision of law").

*See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits").

With that, we offer this summary of our legal conclusions: It is likely that § 265 grants the Executive sweeping authority to prohibit aliens from entering the United States during a public-health emergency; that the Executive may expel aliens who violate such a prohibition; and that under § 1231(b)(3)(A) and the Convention Against Torture, the Executive cannot expel aliens to countries where their "life or freedom would be threatened" on account of their "race, religion, nationality, membership in a particular social group, or political opinion" or where they will likely face torture.

V

Because the Plaintiffs are likely to succeed on the merits of their § 1231 claims, we apply the other preliminary injunction factors to decide whether the Plaintiffs are entitled to relief on those claims.

We conclude that the District Court did not abuse its discretion in finding that the Plaintiffs have established they will suffer irreparable injury absent a preliminary injunction requiring the Executive to afford them withholding-of-removal and Convention-Against-Torture protections. We also conclude that the District Court did not abuse its discretion in determining that the balance of equities favors their request.

A

The Executive makes no credible attempt to deny that the Plaintiffs will suffer irreparable harm if they are expelled to

places where they will be persecuted or tortured. It admits it is "aware of . . . the quite horrific circumstances that non-citizens are in in some of the countries that are at issue here." Transcript of Oral Argument at 27:13-16. And for covered aliens who have already been forced to walk the plank into those places, the record is replete with stomach-churning evidence of death, torture, and rape. App. 344-47, 356-58, 366-67.

The Executive replies that the Plaintiffs will not suffer irreparable harm absent an injunction because vacating the preliminary injunction will "simply preserve the pre-litigation status quo." Appellant's Br. at 53. But that's backwards. "The status quo is the last *uncontested* status which preceded the pending controversy." *District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969) (emphasis added) (cleaned up). The traditional goal of a preliminary injunction is to preserve *that* status quo. *See id.* And in this case, that status quo is the regime in place before the CDC's § 265 orders. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (3d ed. 1998) ("Courts also have awarded preliminary injunctions when it is necessary to compel defendant to correct injury already inflicted by defining the status quo as 'the last peaceable uncontested status' existing between the parties before the dispute developed.").

To be sure, in and of itself, expulsion "is not categorically irreparable" harm. *Nken v. Holder*, 556 U.S. 418, 435 (2009). But elsewhere, the Executive has played up the same injuries from expulsions it plays down here. In defending its repeal of the "Remain in Mexico" policy, the Executive recently said that sending similarly situated aliens to dangerous places "exposes migrants to unacceptable risks" of "extreme

violence." Petition for Writ of Certiorari at 11, 15, *Biden v. Texas*, No. 21-954 (U.S. Dec. 29, 2021). It cited "persecution, abuse, and other harms." *Id.* at 7. And it stated that a policy enabling those injuries does not "align with" its "values." *Id.* at 11.[11]

B

Because the Plaintiffs' irreparable harm is not credibly disputed, the final question is whether the remaining factors favor the Plaintiffs. Those factors are "the balance of equities and the public interest." *See Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019). "When a private party seeks injunctive relief against the government," those two remaining factors "generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Id.*

Here, that weighing exercise is one-sided. As explained above, the Executive has in effect conceded that an injunction would be of tremendous benefit to the Plaintiffs. It would spare them "extreme violence." Petition for Writ of Certiorari at 11, *Biden v. Texas*, No. 21-954 (U.S. Dec. 29, 2021). Plus, the Supreme Court has said that the public has a strong interest in "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

On the other side of the scales is the Executive's questionable claim that COVID-19's spread is slowed in a

---

[11] The Executive says the § 265 Order allows for case-by-case humanitarian exceptions. App. 151. But the Executive has not argued that those exceptions have prevented the harms that the Plaintiffs established in the record. App. 344-47, 356-58, 366-67.

meaningful way by the CDC's § 265 Order — which the Plaintiffs say covers just 0.1% of border crossers. App. 458.

To begin with, the Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests. In *Youngstown Sheet & Tube Co. v. Sawyer*, for example, the Supreme Court affirmed the district court's preliminary injunction of an illegal executive order even though a wartime President said his order was "necessary to avert a national catastrophe." 343 U.S. 579, 582 (1952). More recently, the Supreme Court confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021); *see also NFIB v. Department of Labor*, 142 S. Ct. 661, 666 (2022) (staying an illegal vaccine mandate even though the government said the mandate would save more than 6,500 lives).

Of course, "the public has a strong interest in combating the spread of" COVID-19. *Alabama Association of Realtors*, 141 S. Ct. at 2490. But this is March 2022, not March 2020. The CDC's § 265 order looks in certain respects like a relic from an era with no vaccines, scarce testing, few therapeutics, and little certainty. *Cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 78 (2020) (Breyer, J., dissenting) ("the need for action is immediate, the information likely limited, the making of exceptions difficult, and the disease-related circumstances rapidly changing"). The evidence of the difference between then and now is considerable. *See* Kiran Stacey, *'Full Blown' Pandemic Phase of Covid Nearly Over in U.S., Declares Anthony Fauci*, Financial Times (Feb. 8, 2022), https://www.ft.com/content/3800e619-3404-4e57-a9eb -dab311405c2a; Natalie Andrews & Sabrina Siddiqui, *Some Democrats Push Biden to Embrace Normalcy as Covid-19 Cases Ease*, Wall Street Journal (Feb. 12, 2022), https://www.wsj.com/articles/some-democrats-push-biden-to

-embrace-normalcy-as-covid-19-cases-ease-11644667202. We cannot blindly defer to the CDC in these circumstances.

Absent the § 265 Order, the Executive observes that Customs and Border Protection officials will spend more time with the covered aliens. But the Order itself notes that CBP personnel have access to effective vaccines, abundant testing, and plenty of face masks. App. 137, 141, 146 n.90; *see also Update on Implementation of COVID-19 Vaccination Requirement for Federal Employees*, The White House (Dec. 9, 2021), https://www.whitehouse.gov/omb/briefingroom /2021/12/09/update-on-implementation-of-covid%E2 %81%A019-vaccination-requirement-for-federal-employees (as of last December, 89.5% of Department of Homeland Security employees had received at least one dose of the COVID-19 vaccine). And covered aliens held in congregate settings are given new masks every day. App. 141.

The Executive also speculates about a risk of COVID-19 spreading from aliens held in congregate settings to the general public. But as we've stated multiple times, the preliminary injunction affirmed here does not require "catch and release." It does not bar the Executive from detaining covered aliens until they can be expelled. It only requires the Executive to refrain from expelling them to a place where they will likely be persecuted or tortured. And through an expedited removal process enacted by Congress in 1996, the Executive can quickly expel aliens with non-credible claims for relief under § 1231(b)(3)(A) and the Convention Against Torture.

We are not cavalier about the risks of COVID-19. And we would be sensitive to declarations in the record by CDC officials testifying to the efficacy of the § 265 Order. But there are none. *See* Transcript of Oral Argument at 32:12-17.

To be sure, as with most things in life, no approach to COVID-19 can eliminate every risk. But from a public-health perspective, based on the limited record before us, it's far from clear that the CDC's order serves any purpose. The District Court therefore did not abuse its discretion in determining that the balance of equities favors the Plaintiffs.

\* \* \*

We affirm the District Court's preliminary injunction in part. For now, the Executive may expel the Plaintiffs, but only to places where they will not be persecuted or tortured.

We remand the case for further proceedings and ultimate resolution of the merits, including the Plaintiffs' claim that the § 265 Order is arbitrary and capricious.

*So Ordered.*